UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:09CR 156 SNLJ |
| | ) | |
| DOYLE C. ALCORN, | ) | |
| | ) | |
| Defendant(s). | ) | |

**REPORT AND RECOMMENDATION**

The defendant has filed his Motion to Suppress Evidence and Statements Obtained Through Search and Seizure (Document #19). The government filed its Response (Document #24). Following an evidentiary hearing on the defendant's motion, the defendant filed Defendant's Post-Hearing Memorandum (Document #33), to which the government filed Government's Response to Defendant's Post-Hearing Memorandum (Document #34).

In his motion to suppress evidence and statements, the defendant requests that the court suppress any physical evidence seized in connection with a search conducted on August 11, 2009, or a search conducted on August 20, 2009, and any oral or written statements of the defendant which occurred on either of those two dates or at any other time which the government intends to offer in evidence at trial. (Motion to Suppress, Doc. #19). The defendant offers as grounds for his motion:

    1.    On August 11, 2009, law enforcement officers searched the residence of the defendant in Elsinore, Missouri, without a warrant. At the time of the search, the officers seized marijuana plants and other paraphernalia.

    2.    On August 20, 2009, officers returned to the Alcorn residence and seized additional evidence in the form of a firearm which is the subject matter of Count I of the indictment and other items. On both dates the defendant was interviewed by law

enforcement officers.

3.    The defendant asserts that on the two dates the procedures were made in violation of his rights under the Fourth Amendment, being without a warrant, at his home and not excused by exigent circumstances.

4.    He further argues that any statements made by him on either occasion should be suppressed as involuntary without adequate and proper warnings under Miranda and are the fruit of the unlawful search.

## Factual Background

On August 11, 2009, members of the Missouri State Highway Patrol (MSHP) were engaged in a marijuana eradication effort involving officers on the ground and officers in helicopters in Carter County and Reynolds County, Missouri. Officer Falterman was an observer in a helicopter and Officers Eric Hackman and Shawn Dougherty were on the ground. During the operation, Falterman contacted Hackman and reported seeing some marijuana plants growing in and around a yard in Carter County, Missouri. Falterman hovered in that area until Hackman and Dougherty arrived at the correct house. Then Falterman left the scene to check on another area.

The officers approached the front door of the residence and announced their presence by knocking. Jessica Jones answered the door. Hackman told Jones that some marijuana plants had been located on the residential property by a helicopter observer. Jones stated that the plants belonged to her father and that she would call him with her cell phone. Jones dialed the numbers and handed the phone to Hackman. Hackman told the person who answered the phone that marijuana plants had been observed on the property. The person on the phone stated that he would be there in two minutes.

Doyle Alcorn arrived at the residence within minutes after this call. Hackman explained to him that the helicopter observer had seen marijuana plants on his property. Hackman asked for

consent to search Alcorn's property. Alcorn agreed to the search. Hackman completed a form for a consent search of the property. Hackman then offered the "Consent to Search" form to Mr. Alcorn, which Mr. Alcorn signed. Hackman also read a Miranda warning to Alcorn just after Alcorn signed the form. Mr. Alcorn stated that he knew his rights and he agreed to talk with the officers.

Mr. Alcorn took the officers to various locations on the property, pointing out various marijuana plants. First, Alcorn and the officers went to the garden area next to the home. The officers observed two marijuana plants in the garden. The garden area was visible from a helicopter that might hover over the garden. There were no obstructions or fencing designed to prevent people from seeing the inside of the garden or what was growing there. The garden was located approximately fifteen to twenty feet from the home and was surrounded by a wire fence.

Mr. Alcorn showed the officers a marijuana plant on the porch of the home that was in a pot near the railing of the porch. Mr. Alcorn then took the officers to an area away from the home in an area not maintained as part of the yard. This area was about thirty to forty yards from the home and was described as a brushy area. One marijuana plant was located in this area.

Hackman asked if there was any processed marijuana in the house. Alcorn said that he had some in his recliner in the home. Alcorn and the two officers went inside the residence. Hackman went to the recliner and found a small quantity of marijuana in a side pocket of the living room recliner. Mr. Alcorn showed the officers a quantity of marijuana drying in a laundry room. All of the marijuana was seized.

Hackman then spoke to Alcorn about Alcorn's marijuana. Mr. Alcorn stated that he had been growing marijuana for several years. Mr. Alcorn said that he typically used it and gave it away to his friends, but that he would sell some to recoup his investment. Mr. Alcorn was not arrested at this

time. The officers were called away during the interview so that they could check on another marijuana patch reported by the helicopter observer where persons were burning the crop. Dougherty informed Alcorn that Dougherty would be back later to collect Mr. Alcorn's fingerprints. He could not do so on August 11th because Dougherty did not have his complete fingerprint kit with him. He could not find his ink pad.

Shortly after this visit, Dougherty checked Alcorn's criminal history and discovered that Alcorn was a convicted felon.

A few days after the August 11th visit, Dougherty went back to Alcorn's residence. He met Alcorn at the front door of the house. Alcorn invited Dougherty inside the home, where Dougherty obtained Alcorn's ffingerprints. After Dougherty collected the fingerprints, he asked Alcorn whether he had any firearms in the home. Mr. Alcorn said that he did. Dougherty asked where the firearms were. Mr. Alcorn said he would show the officer. Alcorn led Dougherty into a bedroom and showed him a gun safe. Alcorn was unable to open the safe because he didn't have a key to that safe. Alcorn reported that there were two firearms in that safe. Alcorn then led the officer to Alcorn's bedroom. Alcorn opened a bedroom closet door and removed a soft gun case. Dougherty examined the shotgun that was inside the case. Dougherty then left the home without seizing any firearms. Dougherty did not administer a <u>Miranda</u> warning to Alcorn at any time during this contact.

Dougherty contacted ATF Special Agent John Taylor and reported the discovery of the firearms in Alcorn's home. Taylor and Dougherty went to Alcorn's home on August 20, 2009, where they found Mr. Alcorn. Dougherty introduced Taylor and stated that the officers were there concerning the firearms in the home. Mr. Alcorn took the officers to the gun safe in his daughter's bedroom. He got the key from his daughter and opened the safe, disclosing two firearms. As soon

as the officers saw the firearms, Taylor administered a Miranda warning to Alcorn. Mr. Alcorn said that he understood his rights and agreed to speak with the officers.

Alcorn then told the officers that Carter County Sheriff Greg Melton had advised Alcorn to give his firearms to his daughter. Those two firearms were left in the gun safe in the home.

Dougherty then asked Alcorn if the shotgun Dougherty had seen was still in Alcorn's bedroom. Alcorn said it was and that he would show it to the officers. Mr. Alcorn took the officers to the bedroom and got the gun case out of the closet. Taylor opened the gun case and saw the shotgun in the case. Taylor asked Mr. Alcorn how he acquired the shotgun. Alcorn said that he purchased it from his son-in-law for $150. Taylor asked Mr. Alcorn about his marijuana plants. Mr. Alcorn answered Taylor's questions concerning the marijuana. Taylor seized the shotgun and another round of ammunition located in Alcorn's bedroom.

## **Discussion**

Although defendant's motion to suppress refers to two visits to the defendant's home, as the defendant points out in his post-hearing memorandum, there were actually three visits by law enforcement officers to the defendant's home: 1) on August 11, 2009, Missouri State Highway Patrol Officers Hackman and Dougherty went to the home; 2) on an unknown date, Highway Patrol Officer Dougherty returned to the home; 3) on August 20, 2009, Special Agent John Taylor of the Bureau of Alcohol, Tobacco and Firearms and Trooper Dougherty returned to the defendant's home.

In his post-hearing memorandum, the defendant states that in light of the testimony at the evidentiary hearing, he does not argue that the evidence seized as a result of the search and seizure on August 11, 2009, or the statements made on that date are subject to suppression. His memorandum and argument addressed the statements, searches and seizures occurring on the latter

two dates.

On August 11, 2009, Highway Patrol Officers Eric and Hackman and Shawn Dougherty had gone to the residence of Doyle C. Alcorn after a third Highway Patrol Officer in a helicopter had spotted marijuana growing on the Alcorn property. After interviewing Mr. Alcorn on that occasion and before leaving to go to another site where marijuana had been seen by the helicopter pilot, Trooper Dougherty had indicated to Mr. Alcorn that he would like to come back and get Mr. Alcorn's fingerprints. Trooper Dougherty did not have with him on that occasion his complete fingerprint kit. Mr. Alcorn told Trooper Dougherty that would be fine. (Tr. p. 38).

Trooper Dougherty did return in "just a couple days" (Id.) or "just a few days after" August 11th (Id.) to the Alcorn residence. He knocked on the door and Mr. Alcorn came to the door and invited Trooper Dougherty into the house. (Tr. p. 39). The officer took the fingerprints of Mr. Alcorn. Trooper Dougherty testified that Mr. Alcorn was agreeable to having his fingerprints taken and the conversation between the trooper and Mr. Alcorn was pleasant or cordial. (Tr. p. 39). Trooper Dougherty asked Mr. Alcorn if he had any firearms inside the residence. Mr. Alcorn stated that he did. The trooper asked where they were located and Mr. Alcorn said he would show Officer Dougherty. The officer and Mr. Alcorn went to Alcorn's daughter's bedroom first and Alcorn stated that there were two guns in a gun safe, but he was unable to locate the key. His daughter had the key and she was not at the residence at that time. Mr. Alcorn then took the trooper to his bedroom to a closet that was located in the bedroom. He then removed a .410 shotgun from the closet and showed it to the trooper. It was in a soft case. Trooper Dougherty examined the shotgun but did not seize it. Mr. Alcorn had not been given a <u>Miranda</u> warning prior to the trooper's conversation with him that day. Mr. Alcorn was not asked to sign a consent form to search his property on that

day. Mr. Alcorn was not arrested nor was he placed into handcuffs. His movement was not restricted in any way. Trooper Dougherty testified that he, the trooper, did not tell Mr. Alcorn he could go one place or couldn't go another. Trooper Dougherty had checked after the first visit on August 11, 2009, and found that Mr. Alcorn was a convicted felon. He knew this before returning to take Mr. Alcorn's fingerprints. (Tr. p. 39-42).

It is the defendant's position, as stated in his post-hearing memorandum, that the search conducted on the second visit a few days after the August 11, 2009, consensual search, was a violation of defendant's Fourth Amendment rights. There was no search warrant and the defendant asserts there was no probable cause. "The prior search had been completed, and that completion and the passage of time belies any claim that the earlier consent extended to the events in question here." It is the position of the defendant that the limit of the scope of the consent to search or seize during the second visit was to obtain the fingerprints which were sought and obtained. (Memorandum, p. 3). Mr. Alcorn continued that the initial encounter that led to Trooper Dougherty's entrance into Mr. Alcorn's home on the second visit did not seek consent to a general search of the home or a search for the purpose of looking for evidence of other illegal activity. Mr. Alcorn argues that the interrogation as to the presence of firearms and Alcorn's subsequent assistance in the search which led to the observation both of the gun safe and the cased shotgun in the closet makes the seizure of the shotgun in the closet and Mr. Alcorn's statements on that date and the subsequent date (August 20th) the fruit of the unlawful search beyond the scope of the consents.

Mr. Alcorn's position was further elaborated as follows:

Although they were in Mr. Alcorn's home, the circumstances to a reasonable person would objectively support the belief that he was in custody for purposes of <u>Miranda</u>. First was the shared knowledge of the events of a few days earlier giving rise to the

basis for an arrest. Second was the claimed authority to return for the purpose of obtaining fingerprints. Thirdly, the act of fingerprinting itself is one ordinarily associated in the mind of a lay person with a custodial arrest. Fourthly, the trooper was armed and in uniform.

### **Not All Encounters Between Parties and Individuals are Seizures**

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 477-78, 86 S.Ct. 1602 (1966), the Supreme Court stated:

> General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is in an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

It is interesting and pertinent that following the above quoted statement in footnote 46, the Supreme Court distinguished between in-custody interrogation and general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process which is not affected by the <u>Miranda</u> requirements:

> The distinction and its significance has been aptly described in the opinion of a Scottish court:
>
> "In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient, the modern practice may be, [questioning at the police station] it must normally create a situation very unfavourable to the suspect." <u>Chalmers v. H. M. Advocate</u>, [1954] Sess. Cas. 66, 78 (J.C.).

<u>Id.</u> n. 46.

The visit of Officer Dougherty to the defendant's home is exactly like the visit by Scottish police officers to the house or place of business of a suspect to which the <u>Miranda</u> warnings do not apply. It did not have "the compelling atmosphere inherent in the process of in-custody

interrogation." The Supreme Court also has held that not all encounters between individuals and police are seizures governed by the Fourth Amendment. United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105 (2002); United States v. Mendenhall, 446 U.S. 544, 553 (1980); Terry v. Ohio, 392 U.S. 1, 34 (1968) (White J. concurring). A seizure occurs only when a reasonable person would not feel free to terminate an encounter with the police. Drayton, 536 U.S. at 195.

The Drayton case states, "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." 536 U.S. at 200. Citing Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319 (1983); and Florida v. Rodriguez, 469 U.S. 1, 5-6, 105 S.Ct. 308 (1984) (holding that such interactions in airports are "the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest"). Drayton continues, "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request to consent to search luggage--provided they do not induce cooperation by coercive means." 536 U.S. at 201.

The courts have referred to encounters "on the street." The encounter by Officer Dougherty at the defendant's home was even more favorable to the defendant. He was in his own surroundings where he was most comfortable. As the government points out in its memorandum,

> When a person is questioned "on his own turf", the Eighth Circuit has repeatedly held that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." Czichray, 378 F.3d at 826, citing United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir., 1985); United States v. Wolk, 337 F.3d 997, 1007 (8th Cir., 2003); United States v. Axsom, 289 F.3d 496, 502 (8th Cir., 2002); United States v. Sutera, 933 F.2d 641, 647 (8th Cir., 1991). (Government's Response, Doc. #34, at 10).

The Drayton case, in analyzing whether the defendant was in custody, used a framework it

had previously used in Florida v. Bostick, 501 U.S. at 434-435, 111 S.Ct. 2382. In Bostick, the Florida Supreme Court had suppressed cocaine that officers found after they asked passengers on a bus if the officers could search their luggage. The Florida Supreme Court felt that due to the cramped confines on board a bus, the act of questioning would deprive a person of his or her freedom of movement and so constitute a seizure under the Fourth Amendment. The Supreme Court reversed the Florida Supreme Court.

In applying the Bostick framework to the facts of the Drayton case, the Court concluded that the police did not seize the passengers on the bus when the officers boarded the bus and began questioning the passengers. The Drayton court continued:

> The officers gave the passengers no reason to believe that they were required to answer the officers' questions. When Officer Lang approached the respondents, he did not brandish a weapon or make any intimidating movements. He left the aisle free so that respondents could exit. He spoke to passengers one by one and in a polite, quiet voice. Nothing he said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter.

The Court found that there were ample grounds for the District Court in Drayton to conclude that everything that took place between one of the officers and the respondents suggested that it was cooperative and there was nothing coercive or confrontational about the encounter. The Supreme Court continued that there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. The Supreme Court continued,

> The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure. [citation to Bostick omitted]. Indeed, because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances.

536 U.S. at 204, 122 S.Ct. at 2112.

At Dougherty's second visit to get the fingerprints, he met Mr. Alcorn at the front door of the house. Alcorn invited Dougherty into the home where Dougherty obtained the fingerprints. It was after the fingerprints were taken that he asked Mr. Alcorn whether he had any firearms in the home. Alcorn said he did. Dougherty asked where the firearms were. Alcorn said he would show Dougherty and he led Dougherty into a bedroom and showed him the gun safe. Alcorn did not have a key to that safe, but he reported that there were two firearms in the safe. Alcorn then led Dougherty to Alcorn's bedroom. Alcorn opened the bedroom closet door and removed a soft gun case. Dougherty examined the shotgun that was inside the case. Dougherty then left the home without seizing any firearms. Dougherty did not administer a Miranda warning to Alcorn at any time during this contact.

It was Mr. Alcorn who invited Trooper Dougherty into the home after Dougherty knocked on the front door. The conversation with Mr. Alcorn during that visit was pleasant and cordial. Alcorn was agreeable to having the fingerprints taken. (Tr. p. 38-39). Alcorn volunteered to show Trooper Dougherty where the weapons were in response to Dougherty's question if there were firearms present. Alcorn stated that there were two guns in the gun safe. He then took Dougherty to his bedroom and to the closet. It was Alcorn who removed the .410 shotgun in the soft case from the closet and showed it to Dougherty. Dougherty did not seize any of the weapons that day, nor did he arrest Mr. Alcorn. Alcorn was not placed in handcuffs. His movement was not restricted in any way. Dougherty did not tell Mr. Alcorn he could go one place or couldn't go another. (Tr. p. 39-41).

One of the circumstances the defendant points to as making a reasonable person believe he is in custody was that "the trooper was armed and in uniform." (Memorandum, Doc. #33 at 4). The Drayton Court felt differently:

> Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

Id. at 204-205.

In its responsive memorandum, the government analyzes the question of custody using the framework applied by the Eighth Circuit in United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004). The government sets out those factors in its post-hearing memorandum as follows:

> Those indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning. Martin, supra, citing Griffin, 922 F.2d at 1349. (Doc. #34 at 6-7).

With respect to the first characteristic, whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest, in the Drayton case, the Supreme Court commented as follows:

> The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. See, e.g., Ohio v. Robinette, 519 U.S. 33, 39-40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); Schneckloth v. Bustamonte, 412 U.S. 218, 227,

93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Ibid. Nor do this Court's decisions suggest that even though there are no per se rules, a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, the Court has repeated that the totality of circumstances must control, without giving extra weight to the absence of this type of warning. See, e.g., Schneckloth, supra; Robinette, supra, at 39-40, 117 S.Ct. 417.

The second of the indicia, whether the suspect possessed unrestrained freedom of movement during questioning, indicates that Mr. Alcorn was completely free and, in fact, led the way and showed the weapons to the trooper.

Although Mr. Alcorn did not initiate the contact with authorities, he did voluntarily acquiesce to the officer's questions. There were no requests that Alcorn answer the questions. They were just asked and the defendant responded in words and by his actions of taking Dougherty around his home and showing where the weapons were and, in fact, letting Dougherty inspect the firearm that Alcorn had access to at that time.

There were no strong arm tactics or deceptive stratagems employed by Dougherty (factor 4), the atmosphere of the questioning was not police dominated (5), nor was Mr. Alcorn placed under arrest at the termination of the questioning (6).

The court finds that during Officer Dougherty's second trip to the Alcorn home, when he obtained Mr. Alcorn's fingerprints, Mr. Alcorn was not in custody and, consequently, it was not necessary that Miranda warnings be given before he was asked questions.

### The August 20th Search, Seizure and Questioning

In his memorandum, the defendant argued that the statements made by him on August 20, 2009, were the direct fruit of the unlawful search and interrogation conducted a few days earlier by

Trooper Dougherty which resulted in his statements and his waiver of his consent to search being involuntary. He argued further that the shotguns seized and his statement should be suppressed. All of the evidence seized was shown to the officers voluntarily by the defendant and was properly seized as evidence of crimes.

The court has found that Mr. Alcorn was not in custody during the second visit and that any search and/or interrogation was not unlawful. As a result, the defendant's argument that any statements and seizures which occurred on August 20, 2009, were the result and fruit of the second visit to Mr. Alcorn's home is without merit.

Mr. Alcorn gives as a second reason why the seizure on August 20th of the shotgun should be suppressed is that the consent to that search and seizure was the product of some "oddly misleading police conduct." The defendant points to Bumper v. North Carolina, 391 U.S. 543 (1968), in which the law enforcement officers claimed to possess a search warrant when they did not have it. The Court found a violation of the Fourth Amendment. The Bumper case has no application to the Alcorn case. The defendant's "oddly misleading police conduct" is the fact that Dougherty had not picked up the shotgun from the defendant even though he knew that Alcorn was a convicted felon. The defendant claims that this act on Dougherty's part gave the impression that no illegality existed with reference to the weapon. The court finds the defendant's argument is a "stretch." Trooper Dougherty committed no misleading or deceptive acts in leaving the shotgun for the ATF Agent Taylor to pick up at a later time.

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence and Statements Obtained Through Search and Seizure (Document #19) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections

to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

*/s/ Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of April, 2010.